**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAR 2 5 2019

MITCHELL R. ELFERS
CLERK /mo

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District | New Mexico | Docket or Case No.: |
|---|---|---|---|
| Name *(under which you were convicted)*: Thomas R. Rodella | | | |
| Place of Confinement: Seagoville, Texas | | Prisoner No.: 78448-051 | |
| UNITED STATES OF AMERICA | v. | Movant *(include name under which convicted)* Thomas R. Rodella | |

**MOTION**

1.  (a) Name and location of court which entered the judgment of conviction you are challenging:


    United States District Court for the District of New Mexico, Albuquerque, N.M.

    (b) Criminal docket or case number (if you know): 1084 1:14CR02783-001JB / 14-2783-JB

2.  (a) Date of the judgment of conviction (if you know): ____September 26, 2014____

    (b) Date of sentencing: ____January 21, 2015____

3.  Length of sentence: ____121 months____

4.  Nature of crime (all counts):   1) Deprivation of Rights
    18 U.S.C. §242

    2) Brandishing a Firearm
    18 U.S.C. §924(c)(1)(A)(ii)


5.  (a) What was your plea? (Check one)
    (1) Not guilty [X]      (2) Guilty [ ]      (3) Nolo contendere (no contest) [ ]

    (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or
    what did you plead guilty to and what did you plead not guilty to? **N/A**


6.  If you went to trial, what kind of trial did you have?  (Check one)      Jury [X]      Judge only [ ]

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?      Yes [ ]      No [X]

8.  Did you appeal from the judgment of conviction?      Yes [X]      No [ ]

-1-

9.  If you did appeal, answer the following:

   (a) Name of court:  United States Court of Appeals

   (b) Docket or case number (if you know):  15-2023

   (c) Result:  Affirm district court's judgement

   (d) Date of result (if you know):  November 4, 2015

   (e) Citation to the case (if you know):  Unknown

   (f) Grounds raised:  Sufficiency of the evidence

   Failure to instruct or deminimize injury requirement

   Admission of evidence of other incidence involving Rodella

   Admission of evidence of training materials

   Cumulative errors

   (g) Did you file a petition for certiorari in the United States Supreme Court?     Yes [X]     No [ ]

      If "Yes," answer the following:

      (1) Docket or case number (if you know):  15-1158

      (2) Result:  Denied

      (3) Date of result (if you know):  October 03, 2016

      (4) Citation to the case (if you know):  Unknown

      (5) Grounds raised:  More than Deminimis injury

   Probable cause and provocation

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

   Yes [ ]     No [X]

11. If your answer to Question 10 was "Yes," give the following information:

   (a) (1) Name of court:  **N/A**

      (2) Docket or case number (if you know):  **N/A**

      (3) Date of filing (if you know):  **N/A**

      (4) Nature of the proceeding:  **N/A**

      (5) Grounds raised:  **N/A**

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

      Yes ☐   No ☐  **N/A**

(7)   Result:   **N/A**

(8)   Date of result (if you know):   **N/A**

(b)   If you filed any second motion, petition, or application, give the same information:

  (1)   Name of court:   **N/A**

  (2)   Docket of case number (if you know):   **N/A**

  (3)   Date of filing (if you know):   **N/A**

  (4)   Nature of the proceeding:   **N/A**

  (5)   Grounds raised:   **N/A**

(6)   Did you receive a hearing where evidence was given on your motion, petition, or application?

      Yes ☐   No ☐  **N/A**

(7)   Result:   **N/A**

(8)   Date of result (if you know):   **N/A**

(c)   Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

  (1)   First petition:   Yes ☐   No ☐  **N/A**

  (2)   Second petition:  Yes ☐   No ☐  **N/A**

(d)   If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

Deprived effective assistance of counsel

12.   For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**GROUND ONE:**

Mr. Thomas Robert Rodella was deprived of the effective assistance of counsel when Mr. Robert Gorence failed to call Mr. Rodella as the first defense witness. Thus, Mr. Rodella was deprived of his fundamental due process right to present his case and/or the basic right to be heard in his defense at a fair trial.

(a) Supporting facts:

Mr. Gorence provided advice that effectively deprived Mr. Rodella of an opportunity to give his testimony at trial.  No other witness could have given the recollection that Mr. Rodella could provide of the events in question. Mr. Rodella adamantly fought to testify as the first defense witness.  Mr. Gorence's advice for Mr. Rodella not to testify, resulted in the testimony of the government's witness going unrebutted.  The jury never had an opportunity to hear Mr. Rodella's testimony, which included a number of events that were critical to the jury's ability to formulate a clear picture from the facts of the case.  Mr. Gorence's assistance was ineffective and did deprive Mr. Rodella of an opportunity to be heard.  Thus, Mr. Gorence's ineffectiveness resulted in a miscarriage of justice, where his advice facilitated the jury's verdict convicting Mr. Rodella, who is actually innocent.

Mr. Rodella states that:

1)  On March 11, 2014, Sheriff Rodella was returning home from serving an official function to continue serving as County Sheriff.  Sheriff Rodella and his son, Thomas Robert Rodella Jr. were travelling westbound on State Road 399.  They were driving a four door Jeep Wrangler with Mr. Rodella Jr. at the steering wheel.

2)  At approximately 6:10pm, Mr. Rodella Jr. having entered onto S.R. 399, noticed a blue Mazda approaching S.R. 399 from a private drive that intersected with S.R. 399.  The blue Mazda was travelling too fast to yield to oncoming traffic.

-4-

3)  Sheriff Rodella realized, given the speed of the blue Mazda, and the distance to the intersection, the blue Mazda would be unable to stop.  Recognizing the dangerous situation created by the driver of the Mazda, sheriff Rodella made Mr. Rodella Jr. aware of the situation.

4)  As the blue Mazda entered onto S.R. 399 without stopping at the intersection or yielding to oncoming traffic, Mr. Rodella Jr. braked and swerved, avoiding collision with the blue Mazda.

5)  Immediately, the Mazda accelerated to a high rate of speed.  S.R. 399 was not designed for aggressive driving or high speed.  As the Mazda continued to accelerate, it was obvious the driver of the blue Mazda had no intentions of stopping for a white sedan that was stopped in the westbound lane of S.R. 399, signaling it's intention to turn left.  As the blue Mazda approached the white sedan, it crossed into the eastbound lane, in a no passing zone, clearly with the intention of passing the white sedan.  At the same time a gray colored pick-up came into view in the eastbound lane.

6)  Sheriff Rodella observed the blue Mazda sharply cut back into the westbound lane, when he observed the gray pick-up, clearly recognizing a head-on collision would have occurred had the driver of the blue Mazda not returned to his proper lane.  As soon as the blue Mazda entered the westbound lane, it went off onto the north shoulder.  Sheriff Rodella recognized that the driver of the blue Mazda realized he would be unable to avoid colliding with the stopped white sedan, thus took evasive action by going off onto the shoulder in a side-slide.  As the blue Mazda came to rest on the shoulder, the gray pick-up passed, the white sedan completed it's left hand turn, and Mr. Rodella Jr. came upon the blue Mazda as the driver remained behind the wheel, staring straight ahead with both hands tightly gripping the steering wheel.

7)  As Mr. Rodella Jr. continued west on S.R. 399, Sheriff Rodella instructed

him to remain on the road and stop approximately 15 feet ahead of the blue Mazda. The Sheriff, by state statute, was on duty 24/7, and had a responsibility to find out why the driver of the Mazda was operating the vehicle with such disregard for the law. He set about to investigate the situation and the condition of the driver. As Sheriff, Rodella recognized that he was on duty whether in uniform or not, according to the state law.

8) After the Sheriff's son stopped, the Sheriff exited the Jeep and approached the Mazda with his Sheriff's badge above and in front of him. The driver seemed dazed as he waved for Sheriff Rodella to come closer. The Sheriff was concerned that the driver might be in need of medical assistance, and he approached the car.

9) When the Sheriff was approximately two feet from the Mazda, he heard what he believed to be gravel striking the undercarriage of the car and the front tires spinning. He instinctively jumped out of the way when he realized that the driver was trying to drive away, almost striking him with the Mazda.

10) Sheriff Rodella regained his composure as the Mazda accelerated back onto S.R. 399, continuing in the original direction. The Sheriff returned to his seat on the passenger's side and he instructed his son to follow the Mazda at a safe distance.

11) Again on S.R. 399 heading west, the Rodellas followed the Mazda at times as far back as one thousand yards. Sheriff Rodella placed a phone call to a uniformed Deputy, Vince Crespin, from his cellphone. The sheriff shared the details of the evolving incident with Deputy Crespin and requested assistance in the apprehension and arrest of the Mazda's driver. At that point, the Mazda's driver had driven recklessly and nearly struck the Sheriff with his motor vehicle.

12)  The Rodellas realized that the Mazda's driver had trapped himself in an area of the county that provided him no other exit then to return past the Rodellas.  Notwithstanding the Mazda's high speed, the Sheriff was confident that the driver of the Mazda cound not evade him.  Sheriff Rodella then allowed the Mazda to proceed, observing him from a distance.  Sheriff Rodella was determined to minimize the threat to the community by waiting until additional deputies were available.

13)  Due to the distance between the Mazda and the Jeep, Sheriff Rodella lost visual contact as the Mazda entered a low-lying area of the roadway. Seconds later, Sheriff Rodella saw that the Mazda was stopped in the low-lying area, possibly hoping to evade detection by the county Sheriff.  The lengths the Mazda driver had gone to so far to avoid contact with the Sheriff were concerning.  The Sheriff's thoughts included what possible scenarios would lead the Mazda driver to nearly hit the Sheriff with his vehicle, and to nearly collide with 3 other vehicles.

14)  Directly in front of the Mazda was a stop sign where County Road 126 split off into 3 branches marked as County Road 126A, 126B, and 126C.

15)  Upon seeing the Sheriff's vehicle, the Mazda driver left his hiding spot, speeding through the stop sign and failing to yield to any traffic. The Mazda's driver maneuvered onto County Road 126B.  He was then heading into an inhabited rural area that contained homes and the potential of residents moving about on foot.

16)  As the Mazda continued, it encountered speed bumps in the roadway, forcing it to slow down.  The difference in ground clearance and capability between the Mazda and the Jeep allowed Mr. Rodella Jr. to close the gap between the vehicles to about ten (10) car lengths as the Mazda at times slowed below the speed limit.

17)  Nearing the end of County Road 126B, the Mazda turned onto a dirt road, where he first encountered pedestrians.  Sheriff Rodella observed a male jogger who ran off the road, and onto higher ground.  Sheriff Rodella observed the Mazda pause near the jogger, then continue on.

18)  The Sheriff stopped when he neared the jogger.  As the jogger stepped closer to the Jeep, Sheriff Rodella displayed his badge to him, and verbally identified himself.  Realizing the Mazda may have entered the jogger's property, the Sheriff explained to the jogger that he was after the Mazda driver.  The jogger directed Sheriff Rodella to proceed.  The Sheriff proceeded towards the Mazda.

19)  As the Mazda driver continued onto the property where the house was located, he continued to drive erratically, entering the cul-de-sac and stopping halfway through it.

20)  Sheriff Rodella saw the Mazda driver's apparent disregard for human life during the time he attempted to evade arrest.  This, coupled with the fact they had entered a private drive, dictated to the Sheriff that the driver of the Mazda had to be apprehended quickly, as the danger was increasing.

21)  The Sheriff advised his son to block ingress and egress on the cul-de-sac, protecting any passing motorist from having contact with the Mazda.

22)  The Sheriff exited the Jeep, holding his badge in his left hand with his arm extended in front of him.  As he approached the stopped Mazda, Sheriff Rodella continued to identify himself as the Sheriff in a loud voice, and ordering the Mazda driver out of the vehicle.

23)  When the Sheriff was close enough to see the driver, he could see the driver turning the steering wheel to the left and shifting the car into reverse.  In one sudden motion, the front end of the Mazda swung out to the right, in reverse and the Mazda driver headed directly toward the Sheriff.

The Sheriff realized that he was in immediate danger and could possibly
lose his life.  To avoid being hit or run over by the Mazda, Sheriff Rodella began
to run backwards.

24)  As the Mazda struck the Sheriff, he was able to absorb much of the
impact with his hands.

25)  Before the Mazda came to a sudden stop, Sheriff Rodella had been pushed approx-
imately fifteen(15) feet from the Mazda.  The Sheriff circled around the
passenger's side of the Mazda and ordered the driver to exit the vehicle.
It was then that the Sheriff realized that the Mazda's rear bumper had become
lodged on a large metal pipe that protruded about two (2) feet out of the
ground.

26)  Sheriff Rodella observed the driver quickly shifting in and out of
gear and depressing the Mazda's accelerator.  This was all in an effort
to dislodge the car from the pipe.  The front tires spun in place, filling
the air with dust.

27)  The Sheriff realized that the Mazda driver was determined to flee at
any cost, again placing people in harm.  The Sheriff realized that if he
acted to take control of the Mazda immediately, less then lethal force might accomplish
the task.  Given the Sheriff's proximity to the Mazda, the Sheriff drew
his .38 revolver and held it at the "down and ready" position, in the event
an already extremely dangerous situation escalated.  The Sheriff ordered
the driver to surrender and exit the vehicle as he slowly approached the
Mazda.

28)  Having closed the distance to the Mazda, the Sheriff could see by the
Mazda driver's actions that he would not surrender and the aggressiveness
by which the driver manipulated the transmission and the accelerator clearly sig-
naled to the Sheriff how the danger of the situation increased with the

passage of time.

29)  Knowing that time was of the essence, Sheriff Rodella seized the moment, and having no time to struggle with the Mazda's locked door, he jumped into the car through the passenger-side window.  Sheriff Rodella's upper body landed on the legs of the driver, allowing him to pin the driver against the seat with his left forearm.  Sheriff Rodella further de-escalated the situation by shifting the Mazda's transmission into the "park" position. He then reached for the Mazda's ignition switch, trying to turn the engine off.

30)  When the Sheriff reached for the key in the ignition, the Mazda driver grabbed the barrel of the Sheriff's .38 revolver with both hands.  Sheriff Rodella had a firm grip on the revolver handle, but he feared the Mazda driver was attempting to strip him of his revolver.  Sheriff Rodella was forced to strike the driver three (3) times before the driver surrendered control of the revolver.

It is beyond any reasonable doubt that had the jury heard the facts that would only be available in Mr. Rodella's testimony, the outcome of the trial would more then likely have been quite different.  Mr. Gorence's failure to call Mr. Rodella as the first defense witness likely deprived Mr. Rodella of acquittal in the case.  It is beyond doubt that Mr. Gorence's assistance fell far below reasonable professional norms.  There is no doubt that Mr. Rodella has been prejudiced by his incarceration.  He has had to study federal law at the prison to learn the legal issues that Mr. Gorence deprived him of.

Mr. Rodella's sentence should be vacated and the case be remanded for a new trial.

(b) **Direct Appeal of Ground One:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        Deprived of effective Counsel

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:  **N/A**

Name and location of the court where the motion or petition was filed:

    **N/A**

Docket or case number (if you know):    **N/A**

Date of the court's decision:    **N/A**

Result (attach a copy of the court's opinion or order, if available):

    **N/A**

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐  **N/A**

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐  **N/A**

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐  **N/A**

    (6)  If your answer to Question (c)(4) is "Yes," state:  **N/A**

Name and location of the court where the appeal was filed:  **N/A**

Docket or case number (if you know):  **N/A**

Date of the court's decision:  **N/A**

Result (attach a copy of the court's opinion or order, if available):

    **N/A**

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

Deprived of effective counsel

**GROUND TWO:**

Mr. Rodella was deprived of the effective assistance of counsel during the trial preperation stage of his criminal proceeding.  His attorney, Mr. Gorence, failed to investigate critical issues in the case.  Counsel's failures rendered Mr. Rodella's trial fundamentally unreliable, because counsel's conduct deprived Mr. Rodella of his due process right to present critical defense evidence at trial.

(a) Supporting Facts:

Mr. Rodella adopts, by reference, the facts, contained in ground one here in ground two.  He further explains that Mr. Gorence provided less then adequate representation (ineffective assistance of counsel) when he failed to retrieve the available evidence contained in the public record or in the possession of the government.  This additional evidence would have had a profound impact on Mr. Rodella's trial.  Mr. Gorence failed to review many pieces of evidence to ascertain their veracity.

Moreover, Mr. Gorence advised Mr. Rodella that the government would provide Mr. Gorence with their investigative findings, which did not include the listed items.  Thus, Mr. Gorence violated Mr. Rodella's trust, depriving him of his attorney's honest service.  In support, Mr. Rodella shows:

1)  On May 2, 2014, Mr. Tafoya, the driver of the blue Mazda, made false statements to the Federal Bureau of Investigation Agents at the behest of U.S. Attorney Damon Martinez.  Mr. Tafoya claimed he had been beaten up by Mr. Rodella, Mr. Rodella Jr. and the Rio Arriba Sheriff's deputies in the course of his arrest.

Just four (4) hours after his arrest, Mr. Tafoya was photographed at the jail.  The booking photo of Mr. Tafoya was a part of his arrest record, which is available at the Rio Arriba County detention facility upon request.

Mr Rodella made Mr. Gorence aware of the fact the photo was available and would show that Mr. Tafoya had not suffered any facial injuries, as Mr. Tafoya claimed several days after the incident.

2)  Mr. Rodella shared with Mr. Gorence that Mr. Tafoya had a history of making false statements concerning law enforcement.  During the trial preparation, Mr. Rodella made Mr. Gorence aware of information he had that Mr. Tafoya had been arrested in California for impersonating a police officer and had in his possession a badge he had stolen from a New Mexico State police officer.

Mr. Tafoya had also conspired with petty theft criminal Renee Dominguez, to prepare a false statement, which was given to federal authorities in order to minimize his culpability in the state criminal court.

Confronted with the existence of evidence of Mr. Tafoya's perjured testimony, Mr. Gorence claimed to have spoken to the Federal Bureau of Investigation. Mr. Gorence alleges that the Federal Bureau of Investigation investigated and found that the badge evidence was about a different Michael Tafoya, who had been a dispatcher for the New Mexico State Police, stolen the badge, and been arrested in California for impersonating an officer.  Although Mr. Rodella continued to ask Mr. Gorence to inquire about the matter, Mr Gorence never retrieved the evidence to ascertain it's veracity for himself.

3)  When Mr. Rodella attempted to neutralize the threat Mr. Tafoya posed to the public, Mr. Tafoya attempted to strip Mr. Rodella's revolver by force. When Mr. Rodella tried to turn the Mazda engine off, Mr. Tafoya grabbed the barrel of Mr. Rodella's revolver.  In Mr. Tafoya's effort to strip Mr. Rodella of his revolver, Mr. Tafoya left his fingerprints on the barrel of the revolver in Mr. Rodella's possession.

Mr Rodella's weapon was confiscated during the F.B.I.'s search, but

not once did Mr. Gorence request that the revolver be analyzed for fingerprints. Had Mr. Gorence requested the government's fingerprint evidence from Mr. Rodella's revolver, he could have shown that Mr. Tafoya had, for the third (3) time, used aggressive behavior which could have led to the injury or death of Mr. Rodella, all in the line of duty.

4)  Mr. Gorence failed to interview or depose available witnesses in preparation for Mr. Rodella's trial.  The 911 dispatch logs reflected that two (2) 911 calls were made concerning Mr. Tafoya's arrest.

This belied Mr. Tafoya's claims that he was unaware that Mr. Rodella was the Sheriff.  Thus causing him to fight and resist arrest.  However, in reviewing the 911 record, it is easily discovered that an adolescent male had called 911, and within seconds of calling 911, the adolescent had identifeid Mr. Rodella as a law enforcement officer trying to subdue a dangerous person.

Mr. Gorence failed to review the dispatch logs, therefore failing to identify the eyewitness that would have discredited Mr. Tafoya's false testimony.

This court should vacate Mr. Rodella's sentence and conviction without prejudice so that he may exercise his due proces right to a fair trial.

(b) **Direct Appeal of Ground Two:**

(1)  If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐     No ☒

(2)  If you did not raise this issue in your direct appeal, explain why:

Deprived of effective Counsel

(c) **Post-Conviction Proceedings:**

(1)  Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐     No ☒

(2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:     **N/A**

Name and location of the court where the motion or petition was filed:

**N/A**

Docket or case number (if you know):     **N/A**

Date of the court's decision:     **N/A**

Result (attach a copy of the court's opinion or order, if available):

**N/A**

(3)  Did you receive a hearing on your motion, petition, or application?

Yes ☐     No ☐     **N/A**

(4)  Did you appeal from the denial of your motion, petition, or application?

Yes ☐     No ☐     **N/A**

(5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐     No ☐     **N/A**

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:     **N/A**

Docket or case number (if you know):     **N/A**

Date of the court's decision:     **N/A**

Result (attach a copy of the court's opinion or order, if available):

**N/A**

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

Deprived of effective counsel

**GROUND THREE:**

Mr. Gorence provided ineffective assistance of counsel at trial when he failed to object to plain errors at the trial that affected Mr. Rodella's substantial rights.

(a)  Supporting Facts:

Mr Rodella adopts by reference the facts in grounds one and two here in ground three.  Mr. Rodella explains that during his trial, two (2) related, yet distinctly different plain errors occurred.  Either of the two (2) errors, by itself, would have provided the jury with the fact that more then likely would have resulted in an acquittal.  Mr. Gorence failed to recognize or object to the errors.  Regardless of whether Mr. Gorence's conduct was malicious or incompetent, it rendered his assistance to Mr. Rodella ineffective. Mr. Rodella was subjected to prejudice not only because he was deprived of a fair trial, but also because he is now forced to present his claim in the post-conviction phase rather then on direct appeal.  Mr. Rodella also is not afforded counsel for post-conviction proceedings and must overcome a more stringent standard of review.

1)  The first plain error was when the court determined by a preponderance of the evidence that Mr. Rodella's conduct of protecting the public from a man who had committed acts which could have injured or killed Mr. Rodella was a violent act of the Sheriff!  The duty of fact determination belongs to the jury in a criminal trial.  The court's use of the preponderance standard was a plain error, and Mr. Gorence failed to object.

2)  Mr. Rodella was found guilty of depriving  Mr. Tafoya of his civil rights and brandishing a firearm in the furtherance of a crime of violence, a violation of 18 U.S.C. §924(c)  The predicate for the §924(c) violation was depriving Mr. Tafoya of his civil rights.  However, deprivation of civil rights is not a proper predicate under §924(c) because the crime of deprivation of

rights does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. §924(c)(3)(A).  Thus, for the deprivation of civil rights to qualify as a proper predicate, the crime must constitute a residual clause offense under §924(c)(3)(B), but §924(c)(3)(B) is now unconstitutional.  Accordingly, Mr. Rodella is entitled to vacature of his §924(c) conviction.

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        Deprived of effective Counsel

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:  **N/A**

    Name and location of the court where the motion or petition was filed:

        **N/A**

    Docket or case number (if you know):  **N/A**

    Date of the court's decision:  **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐    **N/A**

    (6)  If your answer to Question (c)(4) is "Yes," state:  **N/A**

    Name and location of the court where the appeal was filed:  **N/A**

    Docket or case number (if you know):  **N/A**

    Date of the court's decision:  **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

        Deprived of effective counsel

**GROUND FOUR:**

The District Court imposed Mr. Rodella's sentence without jurisdiction to enter a judgement.  Moreover, Mr. Gorence's failure to object constituted ineffective assistance of counsel.

(a)  Supporting Facts:

Mr. Rodella adopts by reference facts contained in grounds one (1), two (2), and three(3) here in ground four (4).  He further explains that Mr. Gorence provided ineffective assistance of counsel by failing to recognize and object to the court committing a structural error.  Mr. Rodella further shows that:

1)  The court instructed the jury in a manner that deprived them of their authority to make findings of fact concerning guilt.  Specifically, instruction number seven (7) requires the jury to assume that Mr. Rodella had "road rage" by stating:

> "(i)  Mr. Rodella's motive and intent for pursuing Michael Tafoya was to express his road rage..."

This statement instructs the jury to find that Mr. Rodella was overcome by "road rage".

2)  The court, having decided the fact that Mr. Rodella suffered from "road rage", implied a pre-determination of guilt, regarding the §924(c) count of the indictment, depriving the jury of it's authority.

3)  Following the court's instructions, the jury was left to deliberate. The jury was also given a verdict form with four (4) questions, one (1) of which specifically states, "if your answers to either question three (3), or four (4) is yes, then proceed to question five (5).

4)  In reading the verdict form, you discover that question five (5) is actually a jury determination: "5.  We, the jury, find the defendant, Thomas R. Rodella, guilty or not-guilty as charged in count (1) of the indictment".

Without a presentment of question five (5), it is structurally impossible to make a finding of guilt as to count one (1) of the indictment, based on the facts.  The jury was not instructed as to the relationship of fact as well as law, thus believed that answering yes to either question three (3), or four (4) constituted automatic guilt because of the court's earlier implication that Mr. Rodella had "road rage", an inherently violent act.

Without a valid finding of guilt by the jury, the court is without jurisdiction to impose a sentence.  Mr. Rodella's sentence should be vacated because the court was without jurisdiction to impose the sentence.

(b) **Direct Appeal of Ground Four:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐     No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        Deprived of effective counsel

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

          Yes ☐     No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition:  **N/A**

    Name and location of the court where the motion or petition was filed:

        **N/A**

    Docket or case number (if you know):  **N/A**

    Date of the court's decision:  **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (3)  Did you receive a hearing on your motion, petition, or application?

          Yes ☐    No ☐    **N/A**

    (4)  Did you appeal from the denial of your motion, petition, or application?

          Yes ☐    No ☐    **N/A**

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

          Yes ☐    No ☐    **N/A**

    (6)  If your answer to Question (c)(4) is "Yes," state:  **N/A**

    Name and location of the court where the appeal was filed:  **N/A**

    Docket or case number (if you know):  **N/A**

    Date of the court's decision:  **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

        Deprived of effective counsel

**GROUND FIVE:**

Mr. Rodella received ineffective assistance of counsel at the appellate stage of the proceeding, when counsel failed to raise certain plain errors on direct appeal.

(a)  Supporting Facts:

Mr. Rodella adopts the facts raised in grounds one (1), through four (4) here in ground five (5) and further explicates that his appellate counsel provided ineffective assistance of counsel by failing to raise plain errors that are in the record. After trial, Mr. Rodella was represented by Mr. John D. Cline for the direct appeal stage of his criminal proceeding. Mr. Cline failed to consult the entire trial record, thus he could not raise the obvious plain errors that are in the record. Mr. Rodella now suffers the prejudice of a stricter standard of review.

Had Mr. Cline raised the plain errors at direct appeal, Mr. Rodella would have enjoyed his sixth amendment right to counsel on a plain error standard of review on direct appeal. But, because of counsel's errors, Mr. Rodella must now rely on a "jailhouse lawyer" to present his case of ineffective assistance of counsel in a post conviction proceeding under the cause and prejudice standards of review.

(b) Direct Appeal of Ground **Five:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

        Deprived of effective Counsel

(c) Post-Conviction Proceedings:

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: **N/A**

    Name and location of the court where the motion or petition was filed:

    **N/A**

    Docket or case number (if you know): **N/A**

    Date of the court's decision: **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐    **N/A**

    (6)  If your answer to Question (c)(4) is "Yes," state: **N/A**

    Name and location of the court where the appeal was filed: **N/A**

    Docket or case number (if you know): **N/A**

    Date of the court's decision: **N/A**

    Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

        Deprived of effective counsel

**GROUND SIX:**

Mr. Rodella's incarceration represents a weaponization of the federal criminal justice system that has resulted in a violation of the thirteenth amendment.

(a)  Supporting Facts:

Mr. Rodella's federal prosecution is an extension of a civil dispute between the United States Forest Ranger's and the Rio Arriba County Sheriff's office over control of state law enforcement within  the county's boundaries. 1)  In 1985, Mr. Rodella had been an officer with the New Mexico State Police for approximately three (3) years.  During one of his days off, he visited his family at their home.  His father was a deputy with the Rio Arriba County Sheriff's office.  During their visit, Mr. Rodella's father responded to a request for additional patrol.  He was to investigate a possible incident in an area only accessible by traveling across forest lands.  Mr. Rodella's father responded to the call and Mr. Rodella volunteered to accompany him to provide assistance if necessary.

2)  The alleged incident was reported to have occurred in Archuleta Canyon, in northern Rio Arriba County.  After making their presence known in the area, they began their return trip.  As they drove through forest land, they observed a forest ranger vehicle approximately half a mile off the road.  The ranger appeared to be alone and to have stopped a brown pick-up, and there were two (2) men standing nearby.  Because the area was so isolated, and back-up for the ranger would be minimally one (1) hour away, Mr. Rodella and his father decided to check on the ranger.  Mr. Rodella's father drove the marked sheriff's vehicle to where the ranger was.  After inquiring into his welfare, Mr. Rodella and his father stood by until the ranger finished issuing citations to the two (2) individuals in the brown

pick-up.  Knowing that the two (2) male subjects in the pick-up may be harboring ill-feelings towards the ranger, Mr. Rodella and his father chose to continue providing visibility by patrolling the forest roads.  Believing there would be no further incident resulting from the interaction between the ranger and the two (2) male subjects, Mr. Rodella and his father began to make their way home.  Minutes later the ranger executed a traffic stop on Mr. Rodella's father and cited him for driving off road.  The allged incident for which Mr. Rodella's father was cited, was that he drove off road to where the ranger was citing the two (2) subjects, while doing his welfare check on the ranger himself.

At the hearing before the U.S. Magistrate judge, the judge asked the ranger if the Sheriff and the Ranger's reciprocity agreements were still valid.  When the Ranger answered, "yes", the judge then proceeded to dismiss the matter before him.

3)  In Mr. Rodella's early years, he came to realize that many of the people in Rio Arriba County depended on wood for their stoves and fireplaces. For many of the elderly, it was their only source of heat, their only means of cooking a meal.  Because many of the elderly in the rural communities of Rio Arriba County were on fixed income, modernizing their homes was not an option.  There is something to be said about a meal cooked over a fire.

4)  Years later Mr. Rodella observed forest rangers stopping the citizens of the county, outside of forest land, in county jurisdiction.  Some of these citizens who were stopped by the rangers would be offered the opportunity to forfeit their wood, their chainsaws, and their pick-ups, in lieu of being charged with a crime.  Even though the wood had been obtained legally. The authority to stop and harass county citizens on county land by forest rangers was typically granted by the elected sheriff who commissioned,

or deputized the rangers.  This vested the rangers with the
authority to enforce state laws outside of forest lands, but
within the county.

5)  As a candidate for Sheriff of Rio Arriba County, Mr. Rodella
committed to not commissioning the rangers.  After winning
office in a land-slide Mr. Rodella met with the rangers.
In this meeting, Mr. Rodella made it clear he supported the
rangers, however before he would consider commissioning the
rangers, Mr. Rodella requested they attend culture sensitivity courses.
The rangers refused his offer and again, Mr. Rodella reiterated
his commitment to support the rangers in their endeavors,
yet stood strong on not commissioning the rangers until they
became culturally sensitive.

6)  Shortly thereafter, Aban Lucero, a forest ranger supervisor,
along with a forest service administrator, visited with Mr.
Rodella.  They offered him additional grants for the sheriff's office
if Mr. Rodella commissioned the rangers.  Mr. Rodella, dismayed
by this offer, maintained his position not to commission the
forest rangers until they became culturally sensitive, and
again reiterated his willingness to support the rangers in
any matter that was done legally.

7)  In April 2014, shortly after Mr. Rodella's refusal to
accept "grants" in lieu of commissioning the rangers, he attended
a public meeting with forest administration personnel from
Washington, D.C..  Hundreds of forest land users were also
in attendance.  In the closing minutes of the meeting, Mr.
Rodella was asked to share a few words with the attendees.

He thanked everyone for attending and implored the forest
service representatives to be respectful of the people who
depended on the roadways around the forest lands for travel
and gaining access to life supporting resources.  He continued his
plea that the Forest Rangers be sensitive to the needs of
the county's elderly citizens.  Mr. Rodella's words were part
of his continued effort to overcome the bad feelings that
had led to hostilities and the take over of forest lands and
the Rio Arriba County Courthouse.  The courthouse raid was
in June of 1967, in Tierra Amarilla, N.M.

8)  On May 07, 2014, Mr. Rodella attended a meeting at the
U.S. Attorney's office in Albuquerque, N.M. and was accompanied
by Jake Arnold, Public Information Officer for the Rio Arriba
Sherrif's office; Debbie Rodella, State Representative; and
Felipe Martinez, Rio Arriba County Comissioner.  Also attending
the meeting telephonically for the Rio Arriba County delegation
were, Ted Trujillo, County Attorney and Moises Morales, former County
Commissioner.  Ironically, Mr. Morales had been a leader in
the 1967 courthouse raid, in which a New Mexico State Police
officer and a Rio Arriba County jailer, were seriously wounded by
gunfire.  Two (2) persons were taken hostage by the raiders.
One of the hostages was a Rio Arriba Sheriff's deputy, and
the other was a newspaper reporter.

During the Tierra Amarilla Courthouse raid, the Governor
of the State of New Mexico ordered the New Mexico National
Guard be activated.  Tanks and other heavy military vehicles,
along with air support were dispatched into Rio Arriba County

with orders to bring peace and restore order.

9)  These events were the very matters that Mr. Rodella reminded the attendees about when pleading with the Forest Service Administrators.  Mr. Rodella pleaded that they be a part of any solution that would prevent a repeat of the raid that caused blood shed on American soil.  Sometime later, the jailer who had been shot in the courthouse raid, was found dead, and his body mutilated.  His death has never been solved. Many citizens of the county believe that the killer(s) of the jailer came from within the ranks of the Courthouse raiders.

10)  During a second and private meeting, Mr. Rodella made clear his duties under state law, and questioned the sincerity of U.S.Attorney Damon Martinez, in wanting to find a working solution.  Mr. Martinez, obviously angered by Mr. Rodella's assertion, asked if anyone was recording the meeting.  After receiving confirmation that no one was recording the meeting, Mr. Martinez moved to the edge of his chair, leaned across the table and looked directly at Mr. Rodella, and stated, "if you arrest any forest rangers, I will have you prosecuted." Mr. Rodella recognized that U.S. Attorney Martinez was attempting to hijack Sheriff Rodella's authority, in order to ensure that the forest rangers were able to enforce state laws while on state territory outside of forest lands, and still within the County of Rio Arriba.  Mr. Rodella continuously expressed his concern that forest rangers were violating the Constitutional rights of the citizenry.  The rangers were executing traffic stops outside of forest land boundaries without cause and

then illegally seizing the citizen's property.

11)  Mr. Rodella remained cordial, and thanked everyone for inviting him, and for their attendance.  He quietly gathered his belongings and, accompanied by the Rio Arriba delegation, left the meeting.  Nine (9) days later, Damon Martinez, U.S. Attorney for New Mexico, launched a full scale federal investigation against Mr. Rodella.  One hundred thirty-nine (139) days later, Mr. Rodella was convicted for protecting the county of Rio Arriba.

(b) Direct Appeal of Ground **Six:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

       Deprived of effective Counsel

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:     **N/A**

Name and location of the court where the motion or petition was filed:

  **N/A**

Docket or case number (if you know):     **N/A**

Date of the court's decision:     **N/A**

Result (attach a copy of the court's opinion or order, if available):

        **N/A**

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐    **N/A**

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐    **N/A**

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:     **N/A**

Docket or case number (if you know):     **N/A**

Date of the court's decision:     **N/A**

Result (attach a copy of the court's opinion or order, if available):

        **N/A**

(7)  If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

    Deprived of effective counsel

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

    This is the first round collateral motion

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the you are challenging?    Yes [ ]    No [XX]

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the you are challenging:

    (a) At the preliminary hearing:
        Robert Gorence

    (b) At the arraignment and plea:
        Robert Gorence

    (c) At the trial:
        Robert Gorence

    (d) At sentencing:
        Robert Gorence

    (e) On appeal:
        John D. Clien

    (f) In any post-conviction proceeding:
        Pro Se

    (g) On appeal from any ruling against you in a post-conviction proceeding:
        Pro Se

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?   Yes ☒   No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?   Yes ☐   No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

**N/A**

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐   No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This motion is timely under the actual innocence exceotion established by the Supreme Court.

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1)  the date on which the judgment of conviction became final;

(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief:

Issue a writ of habeas corpus and vacate his sentence.

or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _March 20, 2019_ .
(month, date, year)

Executed (signed) on __Thomas R. Rodella__ (date) March 20, 2019

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

-33-

Thomas R. Rodella #78448-051
P. O. Box 9000 - FCI Seagville
Federal Correctional Institution
Seagoville, Texas  5159-9000

7017 0530 0000 6204 3897

CERTIFIED MAIL®

270

<<78448-951>>

United States District Court
District of New Mexico
333 Lomas Blvd. N.W.
Albuquerque, New Mexico  87102

ATTENTION:  CLERK
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
333 LOMAS BLVD., N.W.
ALBUQUERQUE, NEW MEXICO  87102

U.S. POSTAGE PAID
FM 2-D8V
DALLAS, TX
75253
MAR 21 19
AMOUNT

$0.00
R2304N117152-04

1006        87102






RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

MAR 25 2019

MITCHELL R. ELFERS
CLERK



RECEIVED MAR 20 2019